**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0000382
22-OCT-2014
08:10 AM**

NO. CAAP-13-0000382

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
RICHARD P. SILVA, III, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 11-1-0926)


MEMORANDUM OPINION
(By: Foley, Presiding Judge, Fujise and Leonard, JJ.)

Defendant-Appellant Richard P. Silva, III (**Silva**)
appeals from a March 5, 2013 Judgment of Conviction and Sentence,
entered by the Circuit Court of the First Circuit (**Circuit
Court**),[1] for the following offenses: Reckless Endangering in the
Second Degree in violation of Hawaii Revised Statutes (**HRS**)
§ 707-714(1)(a) (Supp. 2013); Assault in the Second Degree in
violation of HRS § 707-711(1)(d) (Supp. 2013); and Carrying or
Use of Firearm in the Commission of a Separate Felony in
violation of HRS § 134-21 (2011).

I. BACKGROUND

A. Events Leading to the Charges Against Silva

In 1991 or 1992, Silva ·was involved in a fight with
David Kawika Kahanu (**Kahanu**), whom Silva knew from high school.
Kahanu punched Silva in the mouth, and Silva was hospitalized and

---

[1] The Honorable Judge Randal K. O. Lee presided.

received three or four stitches. The two men did not speak for over ten years.

One night in 2006 or 2008, the two men saw each other at The Shack in Mililani Shopping Center (**The Shack**). Kahanu testified that Silva tried to start a fight, but Kahanu declined. Silva testified that Kahanu approached him and said that The Shack was Kahanu's hangout, and Silva was not allowed to go there. Silva left, and the two men did not fight.

On the night of July 3, 2011, Kahanu helped sponsor a fundraiser event at The Shack. Chadwick "Chad" Ceno (**Ceno**), Travis William Joaquin (**Joaquin**), and William "Bill" Peters (**Peters**) were among the attendees. The event ended at around 11 p.m., but many of the attendees remained at The Shack into the early hours of July 4, 2011. Silva was also at The Shack with two friends, but was not attending the event.

1. Silva's testimony

Silva's version of the events differs significantly from that of the State's witnesses. Silva testified that while he was urinating in the bathroom in The Shack, Ceno and Joaquin approached and harassed him, threatening to put him in the hospital and to burn down his family's house in Waipio. When Silva left The Shack, Kahanu and a group of approximately twenty men (including Ceno, Joaquin, and Peters) confronted him. When Silva tried to move away from Kahanu, Joaquin blocked his way, and the group of men "threatened and harassed" him. Peters, who was "yelling," "shouting," and "sticking out his chest," told Kahanu to "break it up" and let Silva go because they were going to meet Silva "at his house in Waipio."

Silva was concerned for his family's safety, because he thought some of the men knew the location of his childhood home in Waipio Valley. He returned to his car and looked for his phone, but could not find it. A thirteen-inch silver hatchet with a black handle, which he used for work, was on the floor of his car. He set it on the passenger seat with the handle on the center console because he thought he might need to use it for protection.

Silva drove to the Jack-in-the-Box across the street from The Shack to look for Kahanu. He testified that he did so because Kahanu and his friends had made threats to go to Silva's family's house,[2] and that he wanted to speak to Kahanu to end the incident. He pulled into the parking lot, rolled down his window, and told Kahanu they needed to talk. Kahanu said, "we go down . . . to the park. I'll meet you there." Silva drove to Kipapa Park (**Park**) and waited for Kahanu.

Silva waited near the Park for a few minutes, and then saw several cars driving near the Park on Kipapa Drive toward Waipio Valley. Concerned, Silva began to drive toward Waipio Valley and noticed a white truck and two other cars driving close behind him. Silva drove past his family's house in Waipio to see if everything was alright, and the truck apparently stopped following him. He then drove back to the Jack-in-the-Box parking lot. Silva told Kahanu to meet him at the Park, and then drove back toward Kipapa Park.

As Silva turned into the street next to the Park, he again noticed a white truck following him. Ceno was driving the truck, and Peters was riding in the passenger seat. Near Kipapa Park, Ceno pulled his truck in front of Silva's car from the left side and parked diagonally, causing Silva to stop. Joaquin, driving a red Dodge Charger, pulled up and parked on the left side of Silva's car.

Peters, who was not wearing a shirt, jumped out of Ceno's truck before it completely stopped and approached the passenger window of Silva's car. Peters yelled at Silva and attempted to open the locked passenger door, inserting his right hand into the partially rolled-down window. Silva picked up the hatchet with his right hand and waved it at Peters, telling Peters to get away from the car.

Ceno and Joaquin approached the driver's window of Silva's car. Ceno was holding a small silver handgun, which he

---

[2] Silva testified that his family's house is about a two or three minute drive from The Shack.

pointed inside the open window at Silva.  Silva grabbed Ceno's hand and twisted the gun away from his face, and then heard the gun fire.  Ceno stepped back a few feet, dropped the gun, held his stomach with both hands, and fell to the ground.  Ceno suffered a through-and-through gunshot wound to his abdomen.

Silva exited his car and grabbed the gun from the road as Ceno tried to grab it.  Silva fired the gun randomly into the dark, attempting to scare the men away.  He threw the gun on the ground near Ceno's truck and drove away.

2.   The State's Witnesses' Testimony

Both Ceno and Joaquin testified that they did not see or speak to Silva inside The Shack.  Kahanu testified that after he saw Silva exit The Shack, he went over and "tapped" Silva and said in a "firm and soft" voice that he was not happy about Silva "hopping around, calling [him] out" the last time they met.  Shortly after Silva and Kahanu began talking, several police cars arrived and the crowd dispersed.

Two to three minutes later, Silva drove up to where Kahanu was standing and said, "[f]ollow me to the park right now."  Kahanu got into his car and began to drive to the Park with his fiancée in the passenger seat, but then realized that he did not want her to be involved and pulled over on the other side of the street.

Around four minutes later, Silva returned, stopped his car in the middle of the road, shouted, "Kawika, follow me, you faggot," and then drove off.  Kahanu's friends told him not to follow Silva, and Kahanu drove home with his fiancée.  In Kahanu's statement to the police, he stated that his "buddies" told him to "go home, take care your family.  We take care him."

Ceno, Peters, and Joaquin testified that they drove to the Park intending to tell Silva to go home because the incident was over.  Ceno denied possessing a gun or any other weapon when he approached Silva's car.  Peters testified that when he was standing near Silva's passenger side door, there was a gun on top of the console, and Silva had his right hand directly over the gun.

When Ceno approached Silva's driver's side window, Silva turned to Ceno, pointed the gun at Ceno, and fired a shot.[3] Peters shouted, "[h]e's got a gun, he's got a gun." Joaquin turned to run across the street, heard more shots, and felt a hot feeling in his lower back. Joaquin fell to the pavement and crawled towards a wall and some trees. He saw two flashes and felt a burning sensation in his right arm and in the right side of his stomach area. Joaquin suffered gunshot wounds to his right side mid-back area, his right stomach area, and his right elbow.

Silva walked to where Ceno was lying on the ground, stood over him, and pulled the trigger of the gun three times. The first time, a bullet discharged, but did not hit Ceno. The gun did not fire the second and third times. Silva then ran to his car and drove towards Waipio Valley.

Between 3:00 and 3:45 a.m. on the morning of July 4, 2011, Silva turned himself in to police.

On the evening of July 4, 2011, a passerby found a five-chamber 38 Special Smith & Wesson Model 60 revolver matching the description of the gun used in the shooting south of Mililani on the northbound shoulder of Kamehameha Highway. A bullet removed from Joaquin's body had markings that were similar to those on test bullets fired from this gun, but ballistics experts were unable to conclude that the gun was used in the shooting.

B.     Procedural History

On July 7, 2011, Plaintiff-Appellee State of Hawai'i (**State**) charged Silva by indictment with the following offenses: Attempted Murder in the First Degree in violation of HRS §§ 705-500 (1993) and 707-701(1)(a) (Supp. 2013) (**Count I**); two counts of Attempted Murder in the Second Degree in violation of HRS §§ 705-500 and 707-701.5 (1993) (**Counts II and III**); two counts of Carrying or Use of Firearm in the Commission of a Separate Felony in violation of HRS § 134-21 (2011) (**Counts IV and V**);

---

[3]     Peters testified during direct examination that he saw Silva shoot Ceno. However, during cross examination, Peters testified that he heard a shot, but did not actually see Silva shoot Ceno.

Ownership or Possession Prohibited of Any Firearm or Ammunition by a Person Convicted of Certain Crimes in violation of HRS §§ 134-7(b) and (h) (2011) (**Count VI**); and Place to Keep Pistol or Revolver in violation of HRS § 134-25 (2011) (**Count VII**).

On August 15, 2011, the Circuit Court appointed the Office of the Public Defender as trial counsel for Silva, citing his financial inability to obtain private counsel.

On February 9, 2012, during a trial call, Silva orally motioned for his trial counsel to withdraw. The court denied the motion.[4]

On November 5, 2012, after the jury had been selected and sworn in, but before opening statements, Silva again orally motioned for his trial counsel to withdraw, alleging that his counsel was not working in his best interests and stating that he was in the process of trying to retain private counsel. The court denied the motion.

On November 14, 2012, during direct examination of Ceno, the Deputy Prosecuting Attorney (**DPA**) asked Ceno how he felt after he had been shot, to which he responded, "I felt like I was going die." Silva's trial counsel did not object to the question or answer.

During direct examination of Joaquin, the DPA also asked Joaquin whether he was "fully recovered" from the incident and asked him to describe what he went through as a result of the incident. Defense counsel objected to the question as irrelevant, but the court overruled the objection because the question went "to whether or not [Joaquin suffered] serious or substantial bodily injury."

Joaquin stated that he got "sketchy" with "some of the things that goes on" and got "flashbacks thinking of that night." Defense counsel again objected, and the court this time sustained the objection and instructed the jury to disregard the answer.

---

[4]     During trial on November 5, 2012, the court noted that Silva had agreed to continue to be represented by his trial counsel after making this motion on the condition that he would receive additional discovery, and that he had not voiced any concerns regarding his counsel since.

Defense counsel orally motioned for a mistrial based on Joaquin's statement. The Circuit Court denied the motion, noting that it had given an instruction to disregard the question and answer.

On November 16, 2012, after the close of the State's case, Silva orally motioned for judgment of acquittal. The court denied the motion. After the close of the defense's case, Silva renewed his motion for judgment of acquittal, and the court again denied it.

On November 21, 2012, during the State's closing argument, the DPA stated the following regarding self-defense: "[W]hat this means, in lay person's language, is if you can leave the scene without using force, and you don't, you can't say self defense." The defense objected to the comment as a misstatement of the law. The court sustained the objection and struck the comment from the record.

The DPA then restated his comment: "So what this instruction is telling you, that if a person is using self defense as his defense, if the opportunity to retreat was not taken, then it is no longer available to you as self defense." The defense again objected, but the court overruled the second objection and let the DPA's second comment stand after the DPA said to the jury, "[w]ell, you can read the instruction yourself." The DPA then cited several instances of Silva's behavior and described them as "not self-defense."

At the end of his closing argument, the DPA told the jury that "either [the DPA is] telling you the truth, or [defense counsel is] telling you the truth. One of us. But not both." Following closing arguments, Silva made a motion for mistrial based on the DPA's comments regarding self-defense and the truthfulness of the attorneys. The court denied the motion.

On November 27, 2012, the jury acquitted Silva as to Counts I, IV, VI, and VII, and convicted Silva of the lesser included offense of Reckless Endangering in the Second Degree in violation of HRS § 707-714(1)(a) as to Count II, the lesser included offense of Assault in the Second Degree in violation of HRS § 707-711(1)(d) as to Count III, and of Carrying or Use of

7

Firearm in the Commission of a Separate Felony with respect to Assault in the Second Degree in violation of HRS § 134-21 as to Count V.

On November 28, 2012, the Circuit Court entered its Findings of Fact, Conclusions of Law, and Order Denying Defendant's [November 5, 2012] Motion to Withdraw as Counsel.

On March 5, 2013, the court sentenced Silva to indeterminate terms of imprisonment of one year as to Count II, five years as to Count III, and twenty years as to Count V, with a mandatory minimum term of imprisonment of three years as to Count III, and all terms to be served concurrently with credit for time served. On April 3, 2013, Silva timely appealed.

II. POINTS OF ERROR

Silva raises the following points of error on appeal:

(1) the Circuit Court abused its discretion in denying Silva's motion to have his counsel withdraw;

(2) the court abused its discretion in denying Silva's motion for mistrial where the DPA (a) elicited improper testimony from the complaining witnesses, and (b) stated during closing argument that either he or defense counsel was lying to the jury;

(3) the DPA committed prosecutorial misconduct during his closing argument by (a) misstating the law related to self-defense, and (b) making misleading remarks describing certain behaviors as "not self-defense;" and

(4) the court erred in denying Silva's motion for judgment of acquittal where there was no substantial evidence to negate his self-defense and choice of evils justifications.

III. APPLICABLE STANDARDS OF REVIEW

"A motion to withdraw as counsel is subject to the 'approval of the court'" and a trial court's denial of a motion for withdrawal is reviewed for an abuse of discretion. State v. Plichta, 116 Hawai'i 200, 214, 172 P.3d 512, 526 (2007) (quoting Hawai'i Rules of Penal Procedure (**HRPP**) Rule 57 (2000)).

The Supreme Court of Hawai'i has applied the following standard of review to the denial of a motion for mistrial:

> The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

State v. Acker, 133 Hawai'i 253, 274, 327 P.3d 931, 952 (2014) (citation omitted).

The court in Acker also articulated the standard applicable to an allegation of prosecutorial misconduct:

> Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial. In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the appellate court considers] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant.

Id. (internal citation and quotation marks omitted).

> The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the [trier of fact], a reasonable mind might fairly conclude guilt beyond a reasonable doubt. This court employs the same standard of review in reviewing a motion for a judgment of acquittal. In reviewing the sufficiency of the evidence supporting a conviction on appeal, the evidence adduced at trial must be considered in the strongest light for the prosecution. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Walton, 133 Hawai'i 66, 90, 324 P.3d 876, 900 (2014) (citation and quotation marks omitted).

IV. DISCUSSION

A. Motion to Withdraw as Counsel

The Supreme Court of Hawai'i recently reiterated that "a criminal defendant has a constitutional right under article I, section 14 of the Hawai'i Constitution to privately retained counsel of his or her choice. This right, however, must be balanced against countervailing governmental interests." State v. Cramer, 129 Hawai'i 296, 301, 299 P.3d 756, 761 (2013) (citing

State v. Maddagan, 95 Hawai'i 177, 180, 19 P.3d 1289, 1292 (2001)). The denial of a continuance to allow a defendant to retain private counsel

> is not per se a denial of the constitutional right to counsel, but the appellate court should scrupulously review the record to determine whether, under all the circumstances, there was an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right toi [sic] effective assistance of counsel.

Id. at 302, 299 P.3d at 762 (citation and quotation marks omitted).

In Cramer, the Court quoted a California case in identifying several factors for a trial court to consider in deciding a motion for substitution of counsel and continuance:

> (1) length of the continuance;
> (2) whether there was a dilatory motive for the continuance;
> (3) whether the prosecution knew of the motions beforehand and whether the prosecution objected;
> (4) whether the delay would have inconvenienced the prosecution or its witnesses;
> (5) whether current court-appointed counsel was prepared to proceed;
> (6) whether the defendant had already retained private counsel; and
> (7) whether the continuance would interfere with the efficient administration of justice.

Id. at 301, 299 P.3d at 761 (citation omitted, format altered). The Court also cited a Wisconsin case that considered the following factors:

> [T]he length of the delay requested, whether competent counsel was presently available and prepared to try the case, whether prior continuances have been requested and received by the defendant, the inconvenience to the parties, witnesses and the court, and whether the delay was for legitimate reasons or whether its purpose was dilatory.

Id. (citation omitted). In the instant case, the record shows that the Circuit Court carefully considered and weighed several of the Cramer factors in making its decision.

When Silva orally motioned for his trial counsel to withdraw and to substitute new counsel, the jury had already been selected and sworn in, and both the State and the defense were ready to proceed with opening statements. Silva had not yet retained private counsel, and admitted that he could not afford to do so at the time. When the court asked Silva to clarify

whether he could afford to hire private counsel, Silva stated, "I'll do whatever I gotta do to get an attorney that's going to help me. . . . I'm in the process right now of trying to get an attorney."

The court allowed Silva to voice his concerns about his trial counsel. The court noted that Silva's trial counsel was an experienced and competent attorney who had "done everything up until th[at] point to zealously represent" Silva and was prepared to proceed. The court also asked the DPA to comment on the motion, and the DPA stated that Silva's trial counsel "ha[d] always been concerned about getting information to Mr. Silva[,]" and had raised several motions in limine that were "appropriate and exhibit[ed] a vigorous attempt to defend Mr. Silva[.]"

The Circuit Court took judicial notice of the records and files in Silva's case dating back to July 14, 2011, and orally reviewed the progress of the case and the actions of Silva's trial counsel in detail. The court noted that it had previously granted continuances on September 1, 2011, October 27, 2011, January 13, 2012, February 16, 2012, May 30, 2012, August 15, 2012, and October 23, 2012. The court also noticed that Silva was unlikely to be able to find and hire a private attorney at that point in the case.

After reviewing these factors, the Circuit Court found that Silva "had presented no reasons amounting to good cause for a substitution of counsel, and appointment of new counsel would delay the trial and disrupt the orderly flow of business in the court system[.]" Based on the record before us, we cannot conclude that the Circuit Court abused its discretion in denying Silva's motion to withdraw and substitute counsel.

B.   The Alleged Prosecutorial Misconduct

Silva asserts that the DPA committed prosecutorial misconduct when he: (1) elicited improper testimony from the complaining witnesses regarding the effect the incident had on them; (2) stated during closing argument that either he or defense counsel was lying to the jury; (3) misstated the law of

self-defense; and (4) made misleading remarks describing certain behaviors as "not self-defense."

Silva contends that the DPA elicited improper testimony from Joaquin[5] about what he went through as a result of the incident in an "attempt to appeal to the emotions and sympathies of the jury." Defense counsel orally motioned for a mistrial, objecting to the DPA's questions as "more prejudicial than probative" and intended "to engender sympathy from the jury[.]"[6] In our view, the DPA's questions, while irrelevant, did not constitute misconduct.

Even assuming the DPA's questioning constituted misconduct, the Circuit Court immediately sustained defense counsel's objection and gave a curative instruction to disregard Joaquin's answer. At the end of the trial, the court also instructed the jury that it "must not be influenced . . . by passion or prejudice against the defendant" and must "conscientiously and dispassionately consider and weigh all of the evidence" in reaching a verdict. These instructions cured any potential prejudice arising from Joaquin's testimony.[7]

---

[5]     Silva's trial counsel did not object to Ceno's testimony that he felt like he was going to die after he was shot. As Silva did not preserve this issue for appeal, we focus solely on whether the DPA's questioning of Joaquin about the effect of the incident on him constituted misconduct. See Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4).

[6]     See, e.g., State v. Rogan, 91 Hawai'i 405, 413, 984 P.2d 1231, 1239 (1999) (prosecutors "should not use arguments calculated to inflame the passions or prejudices of the jury."); State v. Palabay, 9 Haw. App. 414, 430, 844 P.2d 1, 10 (1992).

[7]     See, e.g., State v. Espiritu, 117 Hawai'i 127, 143, 176 P.3d 885, 901 (2008) ("If improper comments are made by a prosecutor, harm or prejudice to [a defendant] can be cured by the court's instructions to the jury.") (citation and quotation marks omitted); Rogan, 91 Hawai'i at 415, 984 P.2d at 1241 ("it is presumed that the jury abided by the court's admonition to disregard the [improper] statement.") (citation omitted); Palabay, 9 Haw. App. at 433, 844 P.2d at 11 (holding that while the court overruled defendant's first objection to complainant holding a teddy bear while testifying, the court shortly thereafter sustained defendant's second objection, making it "highly unlikely that the jury's verdict was swayed by the brief presence of the stuffed animal."); State v. Klinge, 92 Hawai'i 577, 592-93, 994 P.2d 509, 524-25 (2000) (holding that, in light of the court's curative instruction, a prosecutor's isolated improper statement did not amount to prosecutorial misconduct).

During closing argument, the DPA stated: "Now, either I'm telling you the truth, or he's telling you the truth. One of us. But not both." Defense counsel moved for a mistrial, stating that the DPA improperly implied that one of the attorneys was lying. The Circuit Court denied the motion, finding that the DPA's comment, "though not well versed, perhaps, was argument in retort to [defense counsel's] closing argument."

In State v. Klinge, 92 Hawai'i 577, 593, 994 P.2d 509, 525 (2000), the prosecutor told the jury during closing argument that defense counsel was "not going to give [the jury] the whole picture because he has a duty [to] get his client off." The Hawai'i Supreme Court held that "the prosecutor's comment was clearly prosecutorial misconduct[,]" and "strongly disapprove[d] of such reckless and unsupportable comments" as "an impermissible attack on defense counsel's integrity" that "operated to denigrate the legal profession in general." Id. at 595, 527. Similarly, the DPA's comments in this case were improper.

The trial court in Klinge sustained defense counsel's objection and ordered the comment stricken from the record, and also later advised the jury that "[s]tatements or remarks made by counsel are not evidence." Id. Thus, the supreme court held that the remark, "though distasteful and unprofessional, was not so prejudicial as to deny [the defendant] a fair trial." Id.

In the instant case, although the Circuit Court did not sustain all of defense counsel's objections, it immediately instructed the jury to disregard the DPA's comment "in regards to [defense counsel]." The court also gave a specific curative instruction at the end of closing arguments to address the DPA's comments about the truthfulness of the attorneys.[8]

---

[8] Following closing arguments, and in response to defense counsel's motion for mistrial, the court stated:

> [A]s I informed you previously, opening statements and closing arguments are not evidence. And what the attorneys may say during closing arguments is not evidence. And you are not bound by how the attorneys may see or remember the evidence.

(continued...)

Silva next argues that the DPA's "lay" interpretation of Jury Instruction No. 50[9] "left out the fact that the defendant had to <u>know</u> that he could avoid the necessity of using such force with complete safety by [retreating]." First, we agree that the DPA misstated the law under HRS § 703-304(5)(b) (1993) when he stated that "if the opportunity to retreat was not taken, then it is no longer available to you as self defense."[10] As prosecutorial misconduct "refers to any improper action committed by a prosecutor, however harmless or unintentional[,]" this misstatement constituted misconduct. <u>State v. Basham</u>, 132 Hawai'i 97, 112 n.13, 319 P.3d 1105, 1120 n.13 (2014) (citation and quotation marks omitted).

"[A]rguments of counsel which misstate the law are subject to objection and to correction by the court." <u>Id.</u> at 110, 319 P.3d at 1119 (citations and quotation marks omitted). The prejudicial effect of a prosecutor's misstatement of the law is not cured where the court overrules defense counsel's timely objection to the prosecutor's misstatement of the law and fails to give a specific curative instruction. <u>See</u> <u>Espiritu</u>, 117 Hawai'i at 143, 176 P.3d at 901. This is because when defense counsel's objections to such misstatements are overruled, "the jury would reasonably perceive that the misstatement of the law

---

[8](...continued)
> Now, during the course of trial, sometimes -- or in the heat of battle, attorneys say things. In this particular case, you are to disregard [the deputy prosecutor's] comments during his closing arguments with regards to any reference to either -- any of the attorneys lying to you. So you shall disregard and not even consider that argument.

[9] Jury Instruction No. 50 read: "The use of deadly force is not justifiable if the defendant knows that he can avoid the necessity of using such force with complete safety by retreating, but the defendant is not required to retreat from his own dwelling unless he was the initial aggressor."

[10] HRS § 703-304(5)(b) (1993) provides:
> (5) The use of deadly force is not justifiable under this section if:
> . . . .
> (b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating[.]

was not incorrect." Id.; see also Basham, 132 Hawai'i at 110, 319 P.3d at 1118 (holding that the court effectively endorsed the erroneous definitions given by the prosecutor by overruling the defense's objection and not giving a curative instruction).

Additionally, a misstatement of law is not cured where the court has an opportunity to clarify the law to the jury, but fails to do so. See Espiritu, 117 Hawai'i at 143, 176 P.3d at 901 ("the court had an opportunity to clarify the law regarding the [extreme mental or emotional disturbance] defense when defense counsel objected to the [State's] closing argument . . . [but] failed to cure the misstatement by overruling the objection and by not clarifying the law to the jury.") (internal quotation marks and citation omitted). Thus, "the failure to correct misstatements of law by a prosecutor may result in reversal of a defendant's conviction." Id. (citation and quotation marks omitted).

Here, although the Circuit Court sustained defense counsel's first objection and struck the DPA's first paraphrasing of the jury instruction from the record, it did not explain to the jury why or in what way the DPA had misstated the law. Thus, the court did not promptly redress the possible harm caused by the DPA's misstatement of the law of self-defense in that it did not clarify the law or give a curative instruction specifically addressing the misstatement.[11] The DPA proceeded to misstate the law in a similar manner, and when defense counsel again objected, the court overruled the objection and let the DPA's second misstatement stand.

The State argues that, in light of the strong evidence against Silva, "there is no reasonable possibility that the omission of the state of mind when paraphrasing the jury instruction on the duty to retreat contributed to Silva's conviction[.]" We disagree. In Espiritu, the supreme court held

---

[11]     See Espiritu, 117 Hawai'i at 143, 176 P.3d at 901 (finding that the court's general instruction to the jury that "statements or remarks made by counsel are not evidence" was not sufficiently curative, because the misstatement pertained to law and not evidence).

that the prosecutor's multiple misstatements of the law regarding an extreme mental or emotional disturbance (**EMED**) defense were not harmless beyond a reasonable doubt, even when the evidence strongly indicated that the defendant was not acting under EMED or that the defendant's reason for the EMED was not "reasonable." Espiritu, 117 Hawai'i at 143, 176 P.3d at 901. These misstatements "erroneously suggested to the jury that certain prerequisites were necessary to the applicability of the defense," which "was manifestly prejudicial to Petitioner." Id. at 144-45, 902-03.

Here, although the testimony of the State's witnesses was somewhat conflicting, and Silva's version of the events differed significantly from that of the State's witnesses, it was undisputed that Silva shot Ceno and Joaquin. The evidence to negate Silva's self-defense justification, while strong, was not overwhelming.[12] Silva's state of mind based on the events and circumstances leading up to the shootings was a key issue for the jury in determining whether self-defense should apply.[13] Absent the DPA's erroneous and potentially confusing misstatement of the law of self-defense, the jury could have found that Silva acted in self-defense and acquitted him on all charges.[14] We conclude there is a reasonable possibility that the DPA's misstatement of

---

[12] "[W]hen a prosecution's case against the defendant is not overwhelming but turns on the credibility of the defendant, it is likely that the error might have contributed to the conviction." State v. Walsh, 125 Hawai'i 271, 260 P.3d 350 (2011). See also State v. Pacheco, 96 Hawai'i 83, 97, 26 P.3d 572, 586 (2001) (noting that, when acquittal or conviction turned on whether the jury credited the defendant's testimony or the state's evidence, the evidence was not so overwhelming as to overcome the DPA's improper attacks on defendant's credibility).

[13] See Walsh, 125 Hawai'i at 298, 260 P.3d at 377 ("Under the self defense statute, 'the critical factor in determining whether an actor's conduct is justified is the actor's state of mind or belief respecting facts and circumstances.'") (quoting Supplemental Commentary on HRS § 703-300 (1993)).

[14] See Walsh, 125 Hawai'i at 299, 260 P.3d at 378 (holding that, but for the prosecutor's improper attack on the defendant's credibility, the jury could have found that he reasonably believed he was under continuous attack and acted to defend himself, raising a reasonable doubt as to whether the State had disproved his justification of self-defense beyond a reasonable doubt).

the law of self-defense contributed to Silva's convictions, and thus affected Silva's right to a fair trial.[15]

    C.    Silva's Motion for Acquittal

We reject Silva's argument that the State failed to prove his guilt because there was "no substantial evidence to negate Silva's justification defenses of self-defense and choice-of-evils."

Silva raised self-defense against the charges in Counts II and III. As to Count II, the State was required to establish beyond a reasonable doubt that Silva engaged "in conduct that recklessly place[d] [Ceno] in danger of death or serious bodily injury[.]" HRS § 707-714(1)(a). As to Count III, the State was required to establish beyond a reasonable doubt that Silva "intentionally or knowingly cause[d] bodily injury to [Joaquin] with a dangerous instrument[.]" HRS § 707-711(1)(d).

The State[16] also had the burden to prove beyond a reasonable doubt that the force Silva used was not justified under HRS § 703-304, which provides that the use of deadly force is justifiable "if the actor believes that deadly force is necessary to protect himself against death [or] serious bodily injury[.]" HRS § 703-304(2). "[A] person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating[.]" HRS § 703-304(3).

However, self-defense is not a justification for the use of deadly force where "the actor, with the intent of causing serious bodily injury, provoked the use of force against himself in the same encounter[,]" or where the "actor knows that he can avoid the necessity of using such force with complete safety by

---

[15]    Accordingly, we need not address Silva's final contention of prosecutorial misconduct.

[16]    "Self-defense is not an affirmative defense, and the prosecution has the burden of disproving it once evidence of justification has been adduced." State v. Van Dyke, 101 Hawai'i 377, 386, 69 P.3d 88, 97 (2003) (citation omitted). "[O]nce the issue of self-protection is raised, the burden is on the prosecution to disprove the facts that have been introduced or to prove facts negativing the defense and to do so beyond a reasonable doubt." Id. (citation omitted).

retreating[.]" HRS § 703-304(5)(a), (b) (1993). Furthermore, self-defense is not a justification for an offense for which recklessness or negligence are sufficient to establish culpability when "the actor is reckless or negligent in having such belief or in acquiring or failing to acquire any knowledge or belief which is material to the justifiability of the actor's use of force[.]" HRS § 703-310(1) (1993).[17]

It is undisputed that Silva caused a gun to discharge in close proximity to Ceno, and that Ceno suffered a gunshot wound to his abdomen as a result. It is also undisputed that Silva fired several shots in Joaquin's direction while Joaquin was facing away from the gun, as evidenced by the location of his gunshot wounds.

Silva had a history of aggressive or violent encounters with Kahanu, and was confronted while alone by three of Kahanu's friends in a dimly-lit park in the early hours of the morning. The manner in which Ceno and Joaquin purportedly stopped their vehicles "in a blocking trip" limited Silva's movement. Silva testified that Ceno and Joaquin had threatened him earlier that night at The Shack, and that he fired into the dark to scare the men away because he was "scared for his life[,]" did not know what weapons they might have or how many men were there, and "knew their intentions already" as soon as Peters and Ceno approached his car.

The State presented evidence that Silva knew he had multiple opportunities to avoid using deadly force by retreating from or avoiding the Park. The State also presented evidence that Silva provoked the incident by returning to the Jack-in-the-Box and asking Kahanu multiple times in front of Kahanu's friends to meet him at the Park.

---

[17] See State v. Culkin, 97 Hawai'i 206, 216, 35 P.3d 233, 243 (2001) ("HRS § 703-310 quite plainly instructs that self-defense is not available as justification where a defendant believes that the use of force is necessary, but is reckless or negligent in so believing. HRS § 703-310, read in *pari materia* with HRS §§ 703-300 and 703-304, thus reflects the legislature's decision to limit the availability of self-defense as justification to situations in which the defendant's subjective belief that self-defense was necessary is objectively reasonable.") (internal citations omitted).

To prove Silva guilty of Carrying or Use of a Firearm in the Commission of a Separate Felony under HRS § 134-21, the State was required to establish beyond a reasonable doubt that Silva "knowingly carr[ied] on the person or ha[d] within [his] immediate control or intentionally use[d] or threaten[ed] to use a firearm while engaged in the commission of a separate felony[.]" The State also had the burden to prove beyond a reasonable doubt that Silva's conduct was not legally justified by his need to "avoid an imminent harm" under HRS § 703-302.[18] Silva contends that there was insufficient evidence to negate Silva's choice of evils defense as to Count V.[19]

Although there is conflicting evidence regarding who brought the gun to Kipapa Park, the State presented strong evidence that Silva possessed and used the gun at some time during the morning of July 4, 2011 to commit Assault in the Second Degree as to Joaquin. Additionally, the State presented evidence to show that Silva was reckless or negligent in bringing about the situation.[20] Viewing the evidence adduced at trial in the light most favorable to the State, there was substantial

---

[18] HRS § 703-302 (1993) provides, in relevant part:

(1)  Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:
  (a)  The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
  (b)  Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
  (c)  A legislative purpose to exclude the justification claimed does not otherwise plainly appear.

[19]  Silva was charged with two counts of Carrying or Use of a Firearm in the Commission of a Separate Felony in violation of HRS § 134-21 (2011): Count IV (Ceno) and Count V (Joaquin). The jury acquitted Silva on Count IV after finding Silva guilty of the misdemeanor of Reckless Endangering in the Second Degree as to Count II. The jury convicted Silva on Count V in relation to the felony of Assault in the Second Degree as to Count III.

[20]  The choice of evils justification is not available for any offense for which recklessness suffices to establish culpability when the defendant "was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for the actor's conduct[.]" HRS § 703-302(2) (1993).

evidence to support the jury's conclusion that Silva committed the offenses and that the self-defense and choice of evils justifications did not apply.  Thus, we cannot conclude that the Circuit Court abused its discretion in denying Silva's motion for judgment of acquittal.

V.    CONCLUSION

For the reasons stated above, we vacate the Circuit Court's March 5, 2013 Judgment of Conviction and Sentence and remand this case for a new trial.[21]

DATED: Honolulu, Hawai'i, October 22, 2014.

On the briefs:

Jeffrey A. Hawk
(Hawk Sing & Ignacio)
for Defendant-Appellant

Brian R. Vincent
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge

---

[21]    Silva does not argue, and we do not find, that the DPA's misstatement of the law was so egregious that double jeopardy should attach so as to prevent his retrial.  See State v. Mainaaupo, 117 Hawai'i 235, 255, 178 P.3d 1, 21 n.11 (2008) (vacating and remanding for new trial); see also State v. Wakisaka, 102 Hawai'i 504, 516, 78 P.3d 317, 329 (2003) (holding that while the prosecutor's improper comment on the defendant's failure to testify reached the level of reversible error, it "was not so egregious that double jeopardy should attach to prevent retrial").